# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00801-COA

| | |
|---|---|
| KRISTEN LEIGH KIRKLAND LUKE | APPELLANT |

v.

| | |
|---|---|
| JAMES DARYL KIRKLAND | APPELLEE |

| | |
|---|---|
| DATE OF JUDGMENT: | 06/17/2024 |
| TRIAL JUDGE: | HON. PAULA DRUNGOLE-ELLIS |
| COURT FROM WHICH APPEALED: | NOXUBEE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | STEVEN DETROY SETTLEMIRES |
| ATTORNEY FOR APPELLEE: | RICHARD CLARENCE CARTER III |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 12/02/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., LAWRENCE AND WEDDLE, JJ.**

**WEDDLE, J., FOR THE COURT:**

¶1.     Kristen Luke filed a petition in the Noxubee County Chancery Court to modify the visitation rights of her ex-husband, James Kirkland, with the parties' minor son, Ben.[1] The chancellor denied Kristen's petition and granted James's counterclaim for additional visitation. On appeal, Kristen argues that the chancellor abused her discretion and manifestly erred by failing to restrict James's overnight visitation with Ben. Finding no abuse of discretion, clear error, or manifest error, we affirm the chancellor's judgment.

## FACTS

¶2.     James and Kristen were married in 2006 and welcomed their son in 2013. In 2020,

---

[1] We use a pseudonym to protect the privacy of the minor child.

the parties separated. They subsequently filed a joint complaint for an irreconcilable-differences divorce and asked the chancellor to incorporate their property settlement agreement (PSA) in the final judgment of divorce. The parties agreed to joint legal custody of Ben, with Kristen receiving physical custody and James receiving reasonable visitation rights. Relevant to the parties' issues now on appeal, James's visitation with Ben included every other weekend from 6 p.m. on Friday until 6 p.m. on Sunday. The PSA specifically stated that "[t]he above schedule of visitation is to set out the minimum levels of visitation" and that James "is to have liberal visitation at all other reasonable times and places upon which the parties can agree." In March 2021, the chancellor entered the final judgment of divorce, which granted the parties an irreconcilable-differences divorce and fully incorporated the terms of their PSA.

¶3. In May 2023, Kristen filed a petition seeking modification of James's visitation rights and other requested relief. Kristen alleged that on multiple occasions James had kept Ben awake until late into the night and had driven under the influence of alcohol while Ben was in the vehicle. Kristen contended that these incidents not only adversely affected Ben but also constituted a material change in circumstances that warranted the modification of James's visitation rights. Specifically, Kristen requested that the chancellor award her sole legal custody of Ben, require James's visits with Ben to be supervised, and require James to provide twenty-four-hour notice of any reasonable request for visitation.

¶4. James responded to Kristen's petition and filed a counterclaim. James alleged that the visitation schedule outlined in the divorce judgment no longer worked. James contended that

2

Kristen refused to allow the "liberal visitation" that the parties originally contemplated. James therefore asked the chancellor to grant him additional visitation to the amount already specifically set forth in the divorce judgment.

¶5.     At the hearing on her petition, Kristen testified that she was seeking to have James's overnight visitation restricted. According to Kristen, Ben often returned home completely exhausted on Sunday evenings after his weekend visits with James. Kristen stated that James would keep Ben up until late into the night. Kristen further stated that Ben, who was in sixth grade, would then struggle to wake up for school the next morning and would be more irritable than usual.

¶6.     Although the divorce judgment set no curfew for Ben's bedtime, Kristen testified that she and James had spoken multiple times about the need to get Ben to bed at a reasonable time. Kristen stated that despite agreeing to get Ben to bed by 10 p.m., James had failed to uphold his commitment on numerous occasions. Kristen stated that she and James had also had multiple conversations about James's alcohol consumption while Ben was in James's care. Kristen explained that in seeking to restrict James's overnight visitation, she was not trying to punish James. Instead, Kristen testified that she simply did not want James to "be able to keep [Ben] out at all hours, and . . . [she wanted to] have a chance to be able to put [Ben] to bed so he could get the proper rest and make sure that he was getting the care that he needed at night . . . ."

¶7.     In response to questions asked during cross-examination, Kristen did not allege that James had taken Ben with him to bars or casinos. Instead, she explained that James

3

sometimes took Ben to his family's "shop," which was located across the road from his parents' house. Kristen stated that James's brother and her own parents all lived on the same road about a mile from the shop. Kristen testified that she knew James had taken Ben to a crawfish boil at his family's shop, and she stated James had previously admitted to drinking alcohol while eating crawfish. The chancellor asked several questions regarding Kristen's allegations that James had consumed alcohol and then driven Ben in his vehicle. Kristen informed the chancellor that she had not personally seen James drink and then drive with Ben. Rather, Kristen stated, "I have never known [James] to not drink at those times of night at those places."

¶8. Kristen agreed on cross-examination that at the time the parties divorced, they both intended for James to have more visitation than that identified in the "bare[-]minimum schedule" set forth in the divorce judgment. Kristen further agreed that James initially had visitation with Ben almost every weekend. She stated, however, that she began to restrict James's visitation to "the minimum legally required" once she felt that the more liberal visitation was no longer in Ben's best interest. When asked to specify her concerns regarding James's visitation with Ben, Kristen replied, "My concern is that when [James] has [Ben] overnight, [James] is keeping [Ben] out until 11, 12, and 1 o'clock in the morning while consuming alcohol and then driving home with [our] son." In addition, Kristen stated that she was concerned about whether Ben always wore a seatbelt when riding in James's vehicle.

¶9. Kristen's current husband, Jacob Luke, also testified. Jacob corroborated Kristen's testimony that Ben typically returned home from his visits with James more tired and irritable

than usual. Jacob stated that it often took two or three days for Ben to settle back into a regular routine and for Ben's normal temperament to return.

¶10. James testified that he drove trucks for a living and had a commercial driver's license. James stated that he would lose his commercial driver's license if he ever received a citation for driving under the influence. James further stated that he had never been pulled over for driving under the influence, and he adamantly denied that he would get drunk and then drive around with Ben in his vehicle. James explained that his brother currently lived right across from him, and their parents' house and shop were just down the road from his residence. James testified that his family often got together on the weekends. James stated that although there had been times when he had drunk four or five beers over the span of "four or five hours, and a meal or whatever[,]" and then driven home, he had never been intoxicated and driven with Ben in his vehicle. James testified that he had no problem with the chancellor putting a restriction in place stating that he could not drink alcohol when Ben was with him. James emphasized that he simply wanted to avoid having any further restrictions placed on his visits with Ben.

¶11. James admitted there had been one occasion when Ben was with him and they stayed out until 1 a.m. James testified that on the night in question, his family was having a joint birthday celebration for Ben and James's sister. James stated that the family had a crawfish boil and invited plenty of friends and family members who also had children. James testified, however, that over the past year, Ben usually went to bed around 10:30 p.m. during their weekend visits. James stated that he could certainly see the benefit to getting Ben into

5

bed at an earlier time if they were together during the school week. He testified, though, that "[o]n the weekends being I don't get to see [Ben] a lot, I try to get as much as I can out of my weekends" with him.

¶12. James's brother, Justin Jones, confirmed that he lived right across the street from James. Justin acknowledged that he had previously seen James "drink four or five beers over a meal [over] five or six hours, however you want to look at it, and go home." Justin stated, however, that he had never seen James drink to the point of intoxication. Justin also stated that he and James usually tried to wrap up any evening activities on the weekend in time for Justin to get his kids into bed by 10 p.m.

¶13. Kristen's father, Tim Higginbotham, testified that he spent a good deal of time with both James and Ben. Tim stated that he had a good relationship with James and that James appeared to have a very strong relationship with Ben. Tim described James as a good father, and he stated that he had never seen James do anything that would endanger Ben's life.

¶14. Following the hearing, the chancellor issued a lengthy bench opinion, which was subsequently memorialized in the final judgment entered on June 17, 2024. In relevant part, the chancellor's final judgment modified the divorce judgment to include the following provisions:

    a.    [N]either party shall consume alcoholic beverages in the presence of the minor child. Further, neither party is to operate a motor vehicle with the minor child in it after consuming any alcoholic beverage. No social media posts shall be made by either party that exhibits alcohol[,] and no videos involving alcohol shall be made in the presence of the minor child.

    b.    [T]he minor child is to always wear proper, age-appropriate safety

6

equipment, including seatbelts[,] when in the care of either parent.

c.      [T]he parties shall ensure the minor child is in bed by 10:30 P.M. each night, regardless of the day of the week.

Also in the final judgment, the chancellor modified the visitation schedule set forth in the divorce judgment and delineated certain additional times for James to exercise his visitation with Ben. Aggrieved by the chancellor's judgment, Kristen appeals.

## STANDARD OF REVIEW

¶15.    In domestic-relations matters,

> [our] scope of review . . . is limited by the substantial evidence/manifest error rule. This Court will not disturb a chancellor's findings unless they were manifestly wrong or clearly erroneous, or the chancellor applied an erroneous legal standard. Chancellors are afforded wide latitude in fashioning equitable remedies in domestic-relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record. When reviewing a chancellor's decision, we will accept a chancellor's findings of fact as long as the evidence in the record reasonably supports those findings. The chancellor's interpretation and application of the law is reviewed de novo.

*Stuckey v. Stuckey*, 341 So. 3d 1030, 1036 (¶13) (Miss. Ct. App. 2022) (citations and internal quotation marks omitted).

## DISCUSSION

¶16.    Kristen argues that because James allegedly consumed alcohol and then operated his vehicle with Ben inside, the chancellor abused her discretion and manifestly erred by failing to restrict James's overnight visitation with Ben. Our caselaw clearly holds that

> [v]isitation is a matter within the chancellor's sound discretion. The chancellor is charged with fashioning a visitation schedule that is in the best interests of the children, and the chancellor's visitation decision is afforded great deference by this Court. Generally, visitation with the noncustodial

7

parent should be liberal rather than restricted. We have previously explained [that]

> except in unusual circumstances, a noncustodial parent is entitled to unrestricted standard or liberal visitation. Standard visitation includes two weekends a month until Sunday afternoon and at least five weeks of summer visitation plus some holiday visitation. Awarding less is an abuse of discretion unless there is concrete proof of actual harm to a child. Appropriate visitation restrictions often relate to abusive behavior, drug or alcohol abuse, or mental illness.

*Id.* at 1041 (¶36) (quoting *Thomas v. Thomas*, 281 So. 3d 1191, 1204 (¶41) (Miss. Ct. App. 2019)). "To modify a visitation order, it must be shown that the prior decree for reasonable visitation is not working and that a modification is in the best interest of the child." *Fortner v. Bratcher*, 394 So. 3d 452, 459 (¶31) (Miss. Ct. App. 2024) (citation and internal quotation mark omitted).

¶17. In her bench opinion at the conclusion of the parties' testimony and evidence, the chancellor acknowledged that her "paramount consideration" was Ben's "overall best interest." The chancellor first discussed Kristen's request to eliminate James's overnight visitation because Kristen alleged that James's conduct was harmful to Ben. The chancellor noted that Kristen also had alleged the current visitation schedule "is not working because when [Ben] returns from the visitation[, he] is sleepy and may be a little anxious or having some problems because of the lack of rest during the visitation."

¶18. With regard to Kristen's claims, the chancellor found the testimony reflected that Ben was "playing all weekend long" with his cousins who lived across the street from James and that Ben was "more active or very active" during his weekend visitation with James. The

8

chancellor noted that going from a period of increased weekend activity with James to a Sunday evening church service with Kristen might be a difficult transition for Ben and might require "a while for him to get back acclimated . . . ." The chancellor therefore concluded that Ben's tiredness on Sunday evenings when he returned from his weekend visitation with James was an insufficient basis to limit James's overnight visitation schedule. Despite refusing to restrict or eliminate James's overnight visitation, the chancellor stated that going forward, the parties would be prohibited from drinking when Ben was present. In addition, the chancellor provided that the parties should ensure that Ben always wore a seatbelt when in a vehicle with them and that Ben was in bed no later than 10:30 p.m., even during his weekend visitation with James.

¶19. The chancellor next addressed James's counterclaims that the current visitation schedule no longer worked and that he wished for more visitation with Ben. The chancellor noted that Kristen's father, Tim, had specifically testified to the good relationship that existed between James and Ben. When combined with the other testimony presented at the hearing, the chancellor concluded that increased visitation with James was in Ben's best interest. As a result, the chancellor modified James's visitation to reflect a more standard visitation schedule. The chancellor stated, however, that she was denying James's request to begin his weekend visitation on Thursday evenings. The chancellor concluded that such a change would be too disruptive to Ben's weekday schedule, especially considering that Ben had school the following morning.

¶20. Upon review of the record, we find that substantial credible evidence supported the

9

chancellor's determinations regarding James's visitation. We therefore find no abuse of discretion, clear error, or manifest error in the chancellor's refusal to terminate James's overnight visitation or her decision to increase James's visitation to reflect a more standard visitation schedule. Accordingly, we affirm the chancellor's judgment.

## CONCLUSION

¶21. Finding no abuse of discretion, clear error, or manifest error in the chancellor's decision, we affirm the final judgment.

¶22. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER AND LASSITTER ST. PÉ, JJ., CONCUR.**